**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 24-cr-20343-KMW**

**UNITED STATES OF AMERICA**

**vs.**

**ROGER ALEJANDRO PINATE MARTINEZ, and**
**JORGE MIGUEL VASQUEZ,**

      **Defendants.**

_____/

## UNITED STATES' NOTICE OF INTENT TO USE EVIDENCE SUPPORTING THE CHARGED BRIBERY AND MONEY LAUNDERING CONDUCT

The United States of America, by and through undersigned counsel, hereby provides notice of its intent to introduce evidence in its case-in-chief that is intrinsic to, or inextricably intertwined with, the charged conduct, and that is, or would otherwise be, admissible pursuant to Federal Rule of Evidence 404(b). In support of this notice, the government states the following:

## PROCEDURAL AND FACTUAL BACKGROUND

On August 8, 2024, a federal grand jury sitting in the Southern District of Florida returned a six-count indictment, charging Roger Alejandro Piñate Martinez (defendant Piñate) and Jorge Miguel Vasquez (defendant Vasquez) with conspiracy to violate the Foreign Corrupt Practices Act (FCPA), in violation of 18 U.S.C. § 371 (Count One); a substantive violation of the FCPA, in violation of 15 U.S.C. § 78dd-2 (Count Two); and defendants Piñate, Vasquez, Elie Moreno (defendant Moreno), and Juan Andres Donato Bautista (defendant Bautista) with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Three); and promotional money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A) (Counts Four through Six). The indictment alleges an elaborate bribery and money laundering scheme that occurred from approximately May 2015 through February 2018 and involved more than a million dollars in bribes

paid by executives of Company 1 (a private corporation[1]), including defendants Piñate, Vasquez, and Moreno to defendant Bautista, the former Chairman of the Philippine Commission on Elections (COMELEC).   The bribes were paid to obtain, maintain and receive payments on lucrative contracts to provide voting machines and related services to the Government of the Philippines for its May 2016 national and local elections.   The approximate value of these contracts was $182 million.

Company 1 partnered with a Taiwan-based company, identified in the indictment as Vendor A, to manufacture more than 93,000 voting machines for the 2016 Philippine elections. Company 1 agreed to pay Vendor A $56,114,790, via purchase order (PO) 5134, to manufacture voting machines: the SAES 1800 Plus.[2]   As part of this criminal scheme, Defendants Piñate and Vasquez created slush funds by over-invoicing or inflating the cost per SAES 1800 Plus voting machine with additional fees of $50 and $10 per unit.   To conceal the nature and purpose of these slush funds, coded language was used in communications and spreadsheets.   For example, participants referred to the additional $50 per unit payment as the "Extra fee," (also interchangeably called the "Rush fee" or "Roush Fee") and the additional $10 per unit payment as the "Rue."[3]   Company 1 made payments for the voting machine contracts to Vendor A's bank account in Hong Kong, in part, to generate the slush funds.   The slush funds resulting from the 2016 Philippine voting machine contracts amounted to approximately $6 million (nearly $5 million in "Extra fee" and $1 million in "Rue") and were maintained by Vendor A in bank

---

[1]  For purpose of this notice, the private corporation includes Company 1 (as identified in the indictment), and its subsidiaries — including Company 2 and Company 3 (also as identified in the indictment), and will hereinafter be referred to collectively as "Company 1."  *See* Indictment at pp. 2-3.

[2]  The identity of the individuals and companies in this Motion is known to the defense and their names will be presented in open court during trial, or earlier if the Court directs.

[3]  Defendant Piñate directly supervised Vasquez at Company 1.

accounts in Hong Kong.   Throughout the charged conspiracy, defendants Piñate, Vasquez, Moreno, and others, caused Vendor A to make payments from the slush funds originating from PO 5134.  The defendants used the slush funds designated as the "Extra Fee" to pay entities in the Philippines including those associated with defendant Bautista.   These payments included approximately $1 million in bribe payments paid to Baumann Enterprises Limited ("Baumann") in August 2016.  Baumann was a shell company with a bank account in Singapore controlled by defendant Bautista and two of his relatives.  The defendants used the "Rue" slush funds to transfer money to bank accounts in the Southern District of Florida that were controlled by defendant Vasquez and another Company 1 employee.  These transfers included kickback payments.  To disguise the true nature and purpose of the bribe and kickback payments, the transfers were made through shell company bank accounts controlled by Vendor A-Executive, including Shell Company X and Shell Company Y.  The transfers were supported by fraudulent contracts, loan agreements, and invoices.

The government hereby provides notice of its intent to introduce the following evidence in its case-in-chief as intrinsic or inextricably intertwined evidence or, in the alternative, as extrinsic evidence, pursuant to FRE 404(b):

### A.   Kickback payments to defendant Vasquez funded by the 2016 Philippine election contracts ("2016 Philippine election kickbacks").

Because the 2016 Philippine election kickbacks are specifically alleged in Count 1 of the indictment, it is proper for the government to introduce direct evidence of this scheme in its case-in-chief to prove the charged conduct.  This evidence is also inextricably intertwined with the other charged conduct and is properly admissible as intrinsic evidence (or, in the alternative, as evidence appropriately admitted pursuant to FRE 404(b)) against defendants Piñate and Vasquez through,

among other things, witness testimony, financial and business records, and email and text communications.  As noted above, the kickback payments (i.e., the "Rue"), were paid from the same slush funds that were used to pay bribes (i.e., the "Extra Fee").  Both the "Extra Fee" and the "Rue" were funded by over-invoicing the cost of voting machines for the 2016 Philippine election.  Additionally, both the "Extra Fee" and the "Rue" were made during the same time period as the other charged conduct, both types of payments were effectuated by the same actors, using the same bank accounts, and as detailed below, utilizing the same *modus operandi*.

The following excerpts from a spreadsheet that the government intends to introduce at trial demonstrates the interconnected relationship between the "Extra Fee" (bribes) and the "Rue" (kickbacks) payments that originated from Company 1's payments for PO 5134 to Vendor A to create the slush funds.[4]  The defendants then directed Vendor A to send 1) bribes to defendant Bautista's Baumann bank account in Singapore and to his bank accounts in the Philippines, and 2) kickbacks to bank accounts in the Southern District of Florida which were owned and controlled by defendant Vasquez and a Company 1 employee.

---

[4] PO 5134 related to Company 1 payments to Vendor A to manufacture 93,977 SAES-1800 Plus voting machines, which was part of the 2016 Philippine election contracts COMELEC awarded Company 1.

| PO No. | ITEM | QTY | Price | Total | US$ / pc | RUE US$ | 付款記錄 Payment Information |
|---|---|---|---|---|---|---|---|
| 5134.V2 | 1800 PLUS | 98,447 | 570 | 56,114,790 | 10 | 984,470 | |
| | | | | | | (14,470) | 2016.03.28 台灣支付美金現鈔 |
| | | | | | | (125,000) | 2016.04.15 MEGA匯給 COMPUQUEST |
| | | | | | | (160,000) | 2016.14.14 MEGA匯給 CQCC |
| | | | | | | (160,000) | 2016.05.12 MEGA匯給 CQCC |
| | | | | | | (125,000) | 2016.05.16 MEGA 匯給 COMPUQUEST COMPUTER CORP |
| | | | | | | (200,000) | 2016.08.02 MEGA 匯給 CHAMPION CORP |
| | | | | | | (200,000) | 105.08.15 MEGA匯給GRAN SOURCE INVESTMENTS |
| 5894 | JS-HHSA01A-01 | 4,100 | 38 | 155,800 | 1 | 4,100 | |
| 5916 | JS-HHSA01A-01 | 40 | 50 | 2,000 | 0 | | 0不用支付 |
| 5904 | BATTERY | 4,160 | 150 | 624,000 | 5 | 20,800 | |

US$24,900.00

| PO No. | ITEM | Q | Price | Total | US$ pc | Extra Fee US$ | Payment Information |
|---|---|---|---|---|---|---|---|
| 4741V.1 | HICC-20*750 PCS | 750 | 480.00 | 360,000 | 50 | 37,500 | 2015.05.20 貸款已收齊 |
| 5134.V2 | 1800 PLUS | 98,447 | 570.00 | 56,114,790 | 50 | 4,922,350 | |
| 5403 | 1800 PLUS | 30 | 570 | 17,100 | 50 | 1,500 | |
| | | | | | | | 2016.05.09 MANTOVA 匯款給 International Society for krishna USD62500 |
| | | | | | | | 2016.05.09 MANTOVA 匯款給 International Society for krishna USD62500 |
| | | | | | | | 2016.05.09 MEGA 匯給International Society for Krishna USD150000 |
| | | | | | | (275,000) | 2016.05.09 MANTOVA 匯款給 International Society for krishna USD150,000 |
| | | | | | | (150,000) | 105.05.13 MANTOVA匯CL METALS AND WIRE MFG.CORP. USD150,000 |
| | | | | | | (479,780) | 105.05.13 MANTOVA匯APOLLO MANAGEMENTS USD479780 |
| | | | | | | (449,535) | 105.05.16 MEGA匯給APOLLO MANAGEMENTS S.A. USD449535 |
| | | | | | | (63,000) | 105.05.31 MANTOVA匯給INTERNATIONAL SOCIETY FOR KRISHNA |
| | | | | | | (250,000) | 105.05.31 MEGA 匯給 CL METALS AND WIRE MFG.CORP |
| | | | | | | (212,500) | 105.06.01 MEGA 匯給 INTERNATIONAL SOCIETY FOR KRISHNA |
| | | | | | | (550,000) | 105.06.02 MEGA 匯給 CL METALS AND WIRE MFG.CORP |
| | | | | | | (479,780) | 105.06.14MANTOVA匯 APOLLO MANAGEMENT S.A |
| | | | | | | (449,535) | 105.06.14 MEGA匯 APOLLO MANAGEMENT S.A. |
| | | | | | | (235,000) | 105.07.05 MEGA匯 CL METALS AND WIRE MOG.CORP |
| | | | | | | (165,000) | 105.08.12 MEGA匯 CL METALS AND WIRE MFG.CORP |
| | | | | | | (500,000) | 105.08.16 MANTOVA匯BAUMANN ENTERPRISES LIMITED |
| | | | | | | (200,000) | 2016.08.19 MEGA匯給 CL METALS AND WIRE MFG.COPR |
| | | | | | | (500,000) | 2016.08.22 MEGA 匯 BAUMANEE ENTERPRISES LIMITED USD500,000 |
| | | | | | | (75,000) | 2016.10.18 MEGA 匯 SEARCH AND SELECTION USD75000 |
| | | | | | | (100,000) | 2016.10.18 MEGA 匯 INTERNATIONAL SOCIETY FOR KRISHNA USD100000 |
| | | | | | | (25,000) | 2016.10.19 MEGA 匯 JORGE HSBC USD25000 |
| PO-5564 | 1800 PLUS | 453 | 470.00 | 212,910 | 0 | | 先借給 SMTT 等客人買賣 /2015.10.15 Terry E-mail 告知不用支付 |

**B.** **Slush Funds from non-Philippine election contracts.**

The government intends to introduce evidence of similar slush fund transfers involving non-Philippine election contracts as intrinsic and inextricably intertwined with the charged conduct (or, in the alternative, as evidence appropriately admitted under FRE 404(b)) against defendants Piñate and Vasquez.  This evidence includes financial and business records, witness testimony, as well as email and text communications.

*1.     Slush Funds from Venezuelan Election Contracts.*

Prior to the 2016 Philippine elections contracts, the defendants engaged in similar slush fund transfers with Vendor A for voting machine contracts to manufacture election machines for

5

Venezuela.  Specifically, defendants Piñate and Vasquez directed and caused Vendor A to inflate the cost of voting machines and related products for multiple purchase orders for the 2012 regional Venezuelan elections. The purpose of inflating the purchase orders was to fund the "Extra fee" slush fund in the amount of $4,229,500.  From that amount, Vendor A transferred $2,065,500 in February 2013 to two bank accounts in Switzerland associated with two shell companies beneficially owned by defendant Piñate — Vicco Invest & Trade (a $980,500 wire) and Pluto Management (a $1,085,000 wire).  These transfers were all supported by fraudulent contracts and invoices.  Defendant Vasquez sent an email to a Vendor A employee directing him/her to create the fraudulent contracts and invoices relating to these transfers.  In that email, defendant Vasquez labeled the documents as Project "Roussh," but clarified that they relate to the "rush" fee and that "Roussh" was intentionally misspelled "to confuse."

Similarly, defendants Piñate and Vasquez directed Vendor A to inflate the purchase orders for the 2013 Venezuelan elections contract for voting machines and related products, including PO 3761, which resulted in a $500,000 increase of the slush fund in Vendor A's bank accounts. In May 2015, around the beginning of the charged conspiracy, defendants Piñate and Vasquez directed and caused Vendor A to transfer $500,000 from Shell Company X to Piñate's Vicco Invest & Trade bank account in Switzerland.  This transfer was supported by fraudulent contracts and invoices.

Lastly, the defendants inflated the purchase orders for the 2014 Venezuelan elections contract for voting machines and related products, including PO 4546, which resulted in a $975,000 increase of the slush fund in Vendor A's bank accounts.  Just like the 2013 slush fund transfer, in May 2015, defendants Piñate and Vasquez then directed and caused Vendor A to make

two transfers of $500,000 from Shell Company X to Piñate's Vicco Invest & Trade bank account in Switzerland. These transfers were also supported by fraudulent contracts and invoices.

2.      *Slush Funds from Company 1's Contract with Shell Company Y.*

From approximately June 2014 through February 2015, Company 1 paid Vendor A approximately $2,000,000 pursuant to a purported agreement for Company 1 to purchase intellectual property from a shell company owned by Vendor A — Shell Company Y. Company 1 transferred this payment based on PO 006. Subsequently, in May 2015, defendants Piñate and Vasquez directed and caused Vendor A to transfer $1,000,000 from Shell Company Y's bank account to a third shell company that was beneficially owned by defendant Piñate and located in Switzerland — Azzuro United SA.

The following email demonstrates the flow of funds for the "Extra Fee" referred to therein as the "Rush and Roush fee." The email itemized certain payments and referenced purchase orders from the 2013 Venezuelan election (PO 3761), 2014 Venezuelan election contract (PO 4600),[5] and the intellectual property contract (PO 006). It also attached documentation for the $1,000,000 slush fund transfer from Shell Company Y to Azzuro United (from PO 006), and three transfers of $500,000, each to defendant Piñate's Vicco bank account in Switzerland. Also attached were fake invoices and bank account information for Azzuro United and Vicco Invest & Trade.

---

[5] Company 1 financial records indicate that this PO was actually PO #4546 for 19,500 machines.

From: Terry Wang_ 王世陽 <terrywang222002@gmail.com>
To: yellow oneonoe <yellow03172003@yahoo.com.tw>; 葉蕙玲 <jenniferyhe2009@gmail.com>
Date: Fri, 08 May 2015 04:15:19 +0000
Attachments: Invoice Azzuro – Mega Achieve 2015[1].docx (57.48 kB); Invoice Vicco – Mega Achieve 2015[1].docx (57.73 kB); contracts with Mega Achieve 2015.pdf (73.95 kB); Azzuro CHF.pdf (102.93 kB); Azzuro USD[1].pdf (102.34 kB); Vicco CHF.pdf (103.7 kB); Vicco USD.pdf (102.66 kB)

Joyce,
金額若對的話, 則請王太太匯款

平安喜樂
王世陽

From: Jorge Vasquez [mailto:jvasquez@cqcc.com]
Sent: Friday, May 08, 2015 8:33 AM
To: Terry Wang_ 王世陽
Subject: Re: PENDING RUSH

Please proceed with those 2 payments ASAP...
Please see contract, invoices and bank instructions for your reference (they would prefer that you transfer in CHF directly to the Credit Suisse)...
References Numbers: #3761, #006, #4600, #4756

From: Jorge Vasquez [mailto:jvasquez@cqcc.com]
Sent: Tuesday, April 07, 2015 2:09 AM
To: terrywang222002@gmail.com
Subject: PENDING RUSH

Amigo,

We need to pay the accumulated ROUSH fees (please confirm if this is what you have also in your records):

| | | |
|---|---|---|
| 500,000$ | 25$ x 20000 VP1500 (PO# 3761) | |
| 1,000,000$ | From MANTOVA (PO# 006) | |
| 975,000$ | 50$ x 19500 HiCC (PO# 4600) | |
| 37,500$ | 50$ x 750 HiCC (PO# 4741) | ** We will wait for the final payment before issuing the payment of this ** |
| 25,000$ | 50$ x 500 HiCC (PO# 4756) | ** We will wait for the final payment before issuing the payment of this ** |

I'll send you the information of how much and to whom you will send the payments (I'm confirming with my boss), but meanwhile please check and suggest what the invoices and contract should say (I'm attaching the ones we used last time for your reference.

    In the email, defendant Vasquez informed Vendor A that he would tell Vendor A how much, and to where, Vendor A should send the payments from the "ROUSH" fees, and that he was "confirming with my boss," but Vendor A should "check and suggest what the invoices and contract should say. . . ."[6]

    According to bank records, in March 2017, defendant Piñate used money originating from the slush funds to transfer approximately 1,300,000 in Swiss Francs from a Vicco Invest & Trade Swiss bank account, to a United Arab Emirates bank account beneficially owned by Individual 1 (the same Individual 1 referenced in the indictment) for a purported services contract. Individual 1 then used another shell company's bank account in Switzerland, which Individual 1 beneficially owned, to transfer $372,177 on or about April 20, 2017. Another $372,177 transfer was made on or about May 8, 2017, to Philippine Metals Company (the same company referenced in the

---

[6] Certified business records from Google show that Defendant Piñate used the alias email account roush3112@gmail.com.

8

indictment).  This same bank account was utilized by the Philippine Metals Company to transfer bribery funds to defendant Bautista.  Pictured below is a ledger of bribe payments referencing defendant Moreno by his first name, "Elie."  The ledger further shows one of the May 9, 2017, payments ($372,177), and other bribes to defendant Bautista, including payments dated December 19, 2016, ($297,472); February 20, 2017, ($268,772); and March 14, 2017, ($71,000).

**RECONCILATION OF ACCOUNTS**
( Computation based on Gross Remittance)

**PER RECORD**

| DATE | ACTUAL DEPOSIT (Dollar) (A) | RATE (B) | AMOUNT (A x B) |
|---|---|---|---|
| 12/2/2015 | 199,957.00 | 46.35 | 9,268,015.55 |
| 1/20/2016 | 199,980.00 | 46.00 | 9,199,080.00 |
| 4/2/2016 | 149,974.50 | 44.00 | 6,598,878.00 |
| 4/8/2016 | 149,974.50 | 44.00 | 6,598,878.00 |
| 5/20/2016 | 149,972.00 | 44.80 | 6,718,745.60 |
| 6/8/2016 | 249,972.00 | 44.05 | 11,011,266.60 |
| 6/10/2016 | 349,972.00 | 44.05 | 15,416,266.60 |
| 8/25/2016 | 164,972.00 | 44.60 | 7,357,751.20 |
| 9/5/2016 | 199,972.00 | 44.56 | 8,910,752.32 |
| 12/19/2016 | 297,472.00 | 47.85 | 14,234,035.20 |
| 2/20/2017 | 248,772.00 | 47.90 | 12,874,178.80 |
| 1/14/2017 | 70,972.00 | 48.30 | 3,427,947.60 |
| 5/9/2017 | 372,117.00 | 47.54 | 17,690,442.18 |
|  | 2,824,079.00 |  | 129,266,237.65 |

**ELIE**

| DATE | DOLLAR (REAL) (C/B) | DOLLAR (DELIVERED) (D/B) | RATE (B) | REAL (Actual Gross) (C) | DELIVERED (D) |
|---|---|---|---|---|---|
|  |  |  |  | 460,000.00 | 460,000.00 |
| 12/2/2015 | 201,980.50 | 181,148.43 | 46.15 | 9,321,400.00 | 8,360,000.00 |
| 1/12/2016 | 205,063.04 | 183,913.04 | 46.00 | 9,432,900.00 | 8,460,000.00 |
| 3/29/2016 | 322,500.00 | 288,409.09 | 44.00 | 14,190,000.00 | 12,690,000.00 |
| 5/22/2016 | 157,366.07 | 138,616.07 | 44.80 | 7,056,000.00 | 6,210,000.00 |
| 6/1/2016 | 160,045.40 | 140,576.16 | 44.05 | 7,056,000.00 | 6,210,000.00 |
| 6/10/2016 | 434,043.13 | 384,108.97 | 44.05 | 19,119,600.00 | 16,920,000.00 |
| 8/24/2016 | 174,988.79 | 154,752.24 | 44.60 | 7,804,500.00 | 6,901,950.00 |
| 9/28/2016 |  |  |  | 1,060,000.00 | 950,000.00 |
| 11/30/2016 |  |  |  | 530,000.00 | 480,000.00 |
| 12/21/2016 | 317,116.61 | 282,658.50 | 47.85 | 15,174,030.00 | 13,524,969.98 |
| 2/20/2017 | 281,677.54 | 347,270.24 | 47.90 | 13,492,354.40 | 11,844,244.50 |
| 3/30/2017 | 75,792.96 | 65,294.24 | 48.30 | 3,564,200.00 | 3,153,711.80 |
| 4/7/2017 |  |  |  | 3,388,500.00 | 3,000,000.00 |
| 5/9/2017 | 195,700.62 | 172,109.98 | 47.54 | 9,303,750.00 | 8,182,108.60 |
| 6/15/2017 | 106,521.60 | 94,657.13 | 47.54 | 5,064,037.65 | 4,500,000.00 |
|  | 2,630,799.28 | 2,333,909.10 |  | 126,005,271.45 | 111,846,994.88 |

**DM**

| DATE | DOLLAR | RATE | AMOUNT (PER RECORD) | DOLLAR | RATE | AMOUNT (DM) |
|---|---|---|---|---|---|---|
| 12/5/2015 | 199,957.00 | 46.15 | 9,268,015.55 | 200,000.00 | 47.15 | 9,430,000.00 |
| 1/20/2016 | 199,980.00 | 46.00 | 9,199,080.00 | 200,000.00 | 47.00 | 9,400,000.00 |
| 4/2/2016 | 149,974.50 | 44.00 | 6,598,878.00 | 150,000.00 | 45.00 | 6,750,000.00 |
| 4/8/2016 | 149,974.50 | 44.00 | 6,598,878.00 | 153,409.09 | 44.00 | 6,750,000.00 |
| 5/24/2016 | 149,972.00 | 44.80 | 6,718,745.60 | 153,348.21 | 44.80 | 6,870,000.00 |
| 6/27/2016 | 249,972.00 | 44.05 | 11,011,266.60 |  |  |  |
| 6/8/2016 | 349,972.00 | 44.05 | 15,416,266.60 | 400,000.00 | 44.05 | 17,620,000.00 Note 1 |
| 8/26/2016 | 164,972.00 | 44.60 | 7,357,751.20 | 165,000.00 | 44.60 | 7,359,000.00 |
| 12/21/2016 | 297,472.00 | 47.85 | 14,234,035.20 | 300,000.00 | 49.00 | 14,700,000.00 |
| 2/21/2017 | 248,772.00 | 47.90 | 12,874,178.80 | 200,000.00 | 50.00 | 10,000,000.00 Note 2 |
| 3/15/2017 | 70,972.00 | 48.30 | 3,427,947.60 | 70,000.00 | 50.00 | 3,500,000.00 |
| 4/18/2017 |  |  |  | 3,000,000.00 | 56.00 | 3,000,000.00 |
| 5/9/2017 | 372,117.00 | 47.54 | 17,690,442.18 | 186,058.50 | 47.80 | 8,893,596.30 Note 3 |
| 6/17/2017 |  |  |  | 4,500,000.00 |  |  |
|  | 2,624,107.00 |  | 127,855,485.33 | 2,217,815.81 |  | 108,772,596.30 |

Computation ( these amounts were not remitted to DM)

| | | | | |
|---|---|---|---|---|
| Note 1 | 6/8/2016 | - | P | 8,907,533.20 ( $200,000.00 x P44.05 ) |
| Note 2 | 2/20/2017 | - |  | 2,874,178.80 ( 60,000.00 x P47.90 ) |
| Note 3 | 5/9/2016 | - |  | 8,796,845.88 ( 186,058.50 x P47.80 ) |
|  | TOTAL |  |  | 20,478,557.88 |

### 3.   *Slush funds from the 2020 elections contract with Los Angeles County.*

In or around 2019, defendant Vasquez transferred additional funds to the "Rue" slush fund from a contract between Company 1 and Los Angeles County for the former to provide voting machines for the 2020 elections.  The government intends to introduce evidence of this slush fund scheme involving non-Philippine election contracts as being inextricably intertwined with the charged conduct (or, in the alternative, as extrinsic evidence, pursuant to FRE 404(b)) against defendant Vasquez.  This evidence includes financial and business records, witness testimony, as

well as email and text communications.  These slush funds were similarly maintained by Vendor A and payments were made in the same manner as the "Extra fee" and "Rue" created from the 2016 Philippine election contracts.  Specifically, defendant Vasquez directed Vendor A to make payments from the slush funds through shell company bank accounts which Vendor A controlled.  Pursuant to defendant Vasquez's directions, Vendor A made payments to the entities in the amounts designated by defendant Vasquez.  Additionally, defendant Vasquez directed Vendor A to make payments to bank accounts in the Southern District of Florida that he and a Company 1 employee controlled.  The payments were similarly disguised using fraudulent contracts, loan agreements, and invoices.

**C.    Defendant Piñate's Bribe Payment to a Venezuelan Elections Official.**

The government intends to introduce evidence of defendant Piñate's payment of a bribe to Tibisay Lucena Ramírez, a Venezuelan elections official, through witness testimony, photographs, and text communications pursuant to FRE 404(b).  Lucena Ramírez was employed by the Venezuelan National Electoral Council ("CNE") — the governing body that oversaw the electoral process in Venezuela.  Lucena Ramírez served as CNE President from approximately the mid-2000s through June 2020.  Defendant Piñate, in his capacity as the Chief Operating Officer and President of Company 1, engaged in business with the Venezuelan government and, more specifically, with the CNE, to provide voting machines and related services for its elections from about 2004 through 2018.  Between 2017 and 2018, Company 1 and the Venezuelan government had a dispute about the election results.  This dispute caused Company 1 to leave Venezuela and led the Venezuelan government to suspend payments owed to Company 1 under the Venezuelan election contracts.

In exchange for Lucena Ramírez's assistance with Company 1's status as an election services provider in Venezuela going forward, defendant Piñate bribed Lucena Ramírez with the title and use of a residence in Caracas.  The residence was an upper-middle class home with a pool which defendant Piñate owned and controlled through a foreign corporation.  From approximately April 2019 through July 2019, defendant Piñate enlisted the aid of others — including the same Individual 1 named in the indictment — to give control of the residence to Lucena Ramírez.  In text communications, defendant Piñate and others discussed giving the residence to Lucena Ramírez by transferring its title to a third party to conceal the source and nature of the transfer.  Ultimately, Lucena Ramírez took control of the residence, and the government intends to prove and argue that this amounted to a bribe payment for her assistance on election-related business while she was employed at CNE.  The residence is depicted below:

 



**D.     Defendant Vasquez's Obstruction of Justice.**

Pursuant to Rule 404(b), the government intends to introduce evidence of defendant Vasquez's obstruction of justice through, among other things, witness testimony and travel records.  Specifically, in or around November 2019, defendant Vasquez traveled to Taiwan and met with Vendor A-Executive.  Defendant Vasquez explained that he was concerned about the U.S. investigation regarding bribery allegations involving Company 1's efforts to secure the 2016 Philippine elections contracts from COMELEC, and payments made from the slush funds. Defendant Vasquez advised Vendor A-Executive to delete evidence, including records and emails, of payments made from the slush funds.  Vendor A-Executive followed defendant Vasquez's instructions and deleted evidence consisting of emails and files relating to the slush funds.  This included records of the August 2016 bribe payments made to defendant Bautista through Baumann, and kickback payments to defendant Vasquez and another Company 1 employee.

## LEGAL ANALYSIS

**I.     The Proposed Evidence is Intrinsic or Inextricably Intertwined with the Charged Conduct and is Therefore Admissible in the Government's Case-in-Chief.**

Evidence of other bad acts is not extrinsic under Rule 404(b) if it: (1) arose out of the same transaction as the charged offense; (2) is necessary to complete the story of the crime; or (3) is inextricably linked with the charged offense.  *United States v. Ellisor*, 522 F.3d 1255, 1269 (11th Cir. 2008).  It is axiomatic that "[e]vidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if it is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury."  *United*

*States v. McLean*, 138 F.3d 1398, 1403 (11th Cir. 1998) (quoting *United States v. Williford*, 764 F.2d 1493, 1499 (11th Cir. 1985)); *see also United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007) (holding that "evidence is inextricably intertwined with the evidence regarding the charged offense if it forms an 'integral and natural part of the witness's accounts of the circumstances surrounding the offenses to which the defendant was indicted'") (quoting *United States v. Foster*, 889 F.2d 1049, 1053 (11th Cir. 1989)).  Moreover, evidence of uncharged conduct that is part of the same scheme and uses the same *modus operandi* as the charged offenses is admissible as intrinsic evidence outside the scope of Rule 404(b).  *See United States v. U.S. Infrastructure, Inc.*, 576 F.3d 1195, 1210–11 (11th Cir. 2009) (such evidence is admissible if it "is linked in time and circumstances with the charged crime and concerns the context, motive or setup of the crime; or forms an integral part of the crime; or is necessary to complete the story of the crime"); *see also United States v. McNair*, 605 F.3d 1152, 1203-04 (11th Cir. 2010) (in bribery case, upholding admission of other contemporaneous bribes in the same period as inextricably intertwined); *United States v. Ford*, 784 F.3d 1386, 1394 (11th Cir. 2015) (in fraudulent tax refund filing scheme, evidence of uncharged fraudulent tax returns that were filed as part of the scheme was "intrinsic evidence" and outside the scope of Rule 404(b)).  Transactions "connected with the offenses charged have long been used to show a general pattern, the necessary criminal intent, or the guilty knowledge of the defendant."  *United States v. Muscatell*, 42 F.3d 627, 631 (11th Cir. 1995) (in mortgage fraud scheme, upholding admission of evidence of prior mortgage fraud transactions that were part of the same series of transactions as intrinsic).

Under Eleventh Circuit law, the evidence of the kickbacks paid to defendant Vasquez in connection with the 2016 Philippine elections contracts, the slush funds created in relation to the 2012, 2013, and 2014 Venezuelan elections contracts, and the slush funds created from the

13

purported purchase of intellectual property by Company 1 from Shell Company Y are intrinsic, or inextricably intertwined, with the charged bribery and money laundering schemes and are therefore admissible in the government's case-in-chief as intrinsic evidence.

The kickbacks to defendant Vasquez from the 2016 Philippine elections contracts are specifically alleged in (the Manner and Means section of) Count 1 of the indictment. *See* Indictment at 9-10, ¶¶ 5-7 (DE 12).  As such, evidence of the kickbacks is necessary to prove the charged conduct.  The kickbacks to defendant Vasquez from the 2016 Philippine elections contracts are directly linked to the other charged conduct by time and circumstance.  As alleged in the indictment, the defendants established slush funds from which to pay the bribes to secure, maintain, and receive payment on contracts related to the 2016 Philippine elections.  *Id*.  These slush funds were created by over-invoicing Vendor A for the manufacture of voting machines for the Philippine elections.  They were then designated as either 1) the "Extra fee" (also known as "boss's fund" or "Rush fee") to pay bribes or, 2) the "Rue," which was used to pay kickbacks to Defendant Vasquez or other designees.  Payments of the "Extra fee" (bribe money) and the "Rue" (kickback money) came from the same source (slush funds created by over-invoicing manufacturing contracts with Vendor A for the 2016 Philippine election contracts); involved the same parties; and were made using the same *modus operandi* (i.e., defendants Piñate, Vasquez, and Moreno directed Vendor A to make wire transfers, pursuant to fraudulent contracts, loan agreements, or invoices,  through Vendor A-controlled shell companies to specific designees). The "Rue" payments were also made during the same time period as the other charged conduct, were discussed using the same alias/personal email accounts (rather than Company 1-related business email accounts), and were often accounted for on the same spreadsheets (*see supra* p.5) or discussed within the same electronic communications.

The proposed evidence is integral to the charged conduct, and it helps explain the "context, motive and set-up" of the charged crimes.  It is "necessary to complete the story of the crime." *McLean*, 138 F.3d at 1403.  This evidence also demonstrates the defendants' knowledge of, and creation of and control over the slush funds and relationship with Vendor A, context that is essential for proving the charged conduct.  Additionally, and as a matter of fairness, the jury should be allowed to consider what happened to the remaining portion of the slush funds.  Evidence of the kickbacks paid from the 2016 Philippine elections contracts is inextricably intertwined with the charges in the indictment and, therefore, should be admitted as intrinsic evidence.

The 2012/2013/2014 Venezuelan voting machine contracts, and the intellectual property contract, are similarly intrinsic to and intertwined with the charged conduct.  While these slush fund transfers pre-date the charged conspiracies, they funded payments made from the same slush funds during the charged conspiracy.  They also involve the same participants, acting in the same roles, engaging in the same ongoing conduct, and using the same *modus operandi* as in the charged conduct.  This evidence provides critical background evidence necessary to understand the relationship between the defendants, the relationship between defendants  Piñate and Vasquez and Vendor A, and how they set up and administered the slush funds.  *See McLean*, 138 F.3d at 1403– 04 (holding that prior drug dealing was inextricably intertwined where it explained the relationship between the defendant and a witness, and was needed to assess the witness's credibility);[7] *see also United States v. Escalona*, No. 22-CR-20423-RNS/JG, 2023 WL 3093630, at *3 (S.D. Fla. Apr. 25, 2023) (in money laundering case, court found that past bribes provided a logical backdrop

---

[7] In addition to providing essential background information, evidence of the other contracts funding the slush funds will be critical to the factfinder in assessing the credibility of witnesses, whom the government intends to call at trial. Two such witnesses already testified for the government in Rule 15 depositions in Taiwan regarding aspects of the "Extra Fee" and "Rue" slush funds and their direct connection to Company 1.

about how and why the defendant became involved in charged conduct and were therefore admissible as intrinsic evidence); *United States v. Trujillo*, No. 21-CR-20303-DPG, 2023 WL 2989085, at *2 (S.D. Fla. Apr. 18, 2023) (finding evidence of a defendant's earlier participation in an insurance fraud scheme to be admissible as "inextricably intertwined with the evidence regarding the charged Medicare bust-out and money laundering schemes" and also admissible under Rule 404(b)); *United States v. Marti*, No. 05-CR-20849-JEM/TEB, 2007 WL 9725021, at *6 (S.D. Fla. Mar. 20, 2007) (court found evidence of an uncharged insurance scheme intrinsic to the charged conspiracy as evidence of the arrangement between co-conspirators and the defendants' involvement in the conspiracy).   The slush fund payments and transfers also demonstrate that the defendants had knowledge and ongoing control of the slush funds, which served as the payment mechanism for funding the bribe payments alleged in the indictment.

Accordingly, the United States submits that evidence of the kickbacks paid from the 2016 Philippine elections contracts, the slush fund transfers from the 2012/2013/2014 Venezuelan election contracts, and the slush fund transfers related to the purported intellectual property contract are intrinsic or inextricably intertwined with the charged conduct, and are, therefore, admissible at trial.

## II.     The Proposed Evidence Should also be Admitted, in the alternative, as 404(b) Evidence.

### A.     FRE 404(b) – generally.

In the alternative, evidence of the kickbacks paid from the 2016 Philippine election contracts, the slush fund transfers from the 2012/2013/2014 Venezuelan election contracts, and the slush fund transfers related to the purported intellectual property purchase, and defendant

16

Vasquez's obstruction of justice should be admitted under FRE 404(b).  Defendant Piñate's bribe to Venezuelan elections official Lucena Ramírez should similarly be admitted under FRE 404(b).

This rule provides that evidence of an uncharged "crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with that character."  Fed. R. Evid. 404(b)(1).  Such evidence may be admissible for other purposes such as intent, knowledge, identity, proof of motive, opportunity, plan, or absence of mistake or accident.  Fed. R. Evid. 404(b)(2).

Courts in this Circuit apply a three-prong test to assess the admissibility of evidence under Rule 404(b): "First, the evidence must be relevant to an issue other than the defendant's character. Second, as part of the relevance analysis, there must be sufficient proof so that a jury could find that the defendant committed the extrinsic act.  Third, the evidence must possess probative value that is not substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of Rule 403."  *United States v. Jernigan*, 341 F.3d 1273, 1280 (11th Cir. 2003) (*abrogated in part on other grounds by Rehaif v. United States*, 588 U.S. 225 (2019)); s*ee Edouard*, 485 F.3d at 1344) (applying same three-part test).

The Eleventh Circuit has recognized that Rule 404(b) is "a rule of inclusion, and . . . accordingly '404(b) evidence, like other relevant evidence, should not lightly be excluded when it is central to the prosecution's case.'"  *Jernigan*, 341 F.3d at 1280 (quoting *United States v. Perez-Tosta*, 36 F.3d 1552, 1562 (11th Cir. 1994)) (*accord United States v. Stephens*, 365 F.3d 967, 975 (11th Cir. 2004)).  Rule 404(b) is a rule "of inclusion which allows [extrinsic] evidence unless it tends to only prove criminal propensity.  The list provided by the rule is not exhaustive and the range of relevancy outside the ban is almost infinite."  *Stephens*, 365 F.3d at 975 (quoting *United States v. Cohen*, 888 F.2d 770, 776 (11th Cir. 1989) (internal quotations omitted)).

## B.    The proposed evidence is highly relevant to the charged conduct.

The proposed evidence meets the first *Jernigan* prong because it is not offered to show the character the defendants, rather it is relevant to prove intent, knowledge, identity, motive, as well as preparation and planning of the charged conduct.  These are all permissible purposes under the Federal Rules of Evidence.  *See* Fed. R. Evid. 404(b)(2).

### 1.   Slush funds and kickbacks.

Evidence of the slush funds and kickbacks are highly relevant to the intent and knowledge of defendants Piñate and Vasquez.  Any defendant who enters a not guilty plea makes his intent to commit the act for which he is charged a material issue and imposes a substantial burden on the Government to prove intent, which may be done by qualifying Rule 404(b) evidence.  *United States v. Zapata*, 139 F.3d 1355, 1358 (11th Cir. 1998); *see also McNair*, 605 F.3d at 1204 (upholding admission of evidence of similar, uncharged bribes in bribery case because evidence was (inextricably intertwined but also) "relevant to show corrupt intent"); *United States v. Barrington*, 648 F.3d 1178, 1186 (11th Cir. 2011) ("By pleading not guilty, [defendant] placed his intent to participate in the grade changing scheme in issue"; finding that extrinsic act evidence was highly probative where defendant claimed that he was merely present during criminal activity).  This is particularly true in a conspiracy case.  *See United States v. Matthews*, 431 F.3d 1296, 1310-11 (11th Cir. 2005) ("In every conspiracy case, a not guilty plea renders the defendant's intent a material issue.  Evidence of such extrinsic evidence as may be probative of a defendant's state of mind is admissible unless the defendant affirmatively takes the issue of intent out of the case.").

"Where the extrinsic offense is offered to prove intent, its relevance is determined by comparing the defendant's state of mind in perpetrating both the extrinsic and charged offenses." *United States v. Dorsey,* 819 F.2d 1055, 1059 (11th Cir. 1987).  Thus, where the state

of mind required for the charged and extrinsic offenses is the same, the first prong of Rule 404(b) test is satisfied.  *Id.*; *United States v. Dickerson,* 248 F.3d 1036, 1047 (11th Cir. 2001). Additionally, the similarities between the extrinsic offenses and the charged conduct weigh heavily in favor of their admission.  *See United States v. Cardenas*, 895 F.2d 1338, 1344 (11th Cir. 1990) (citation omitted) ("The probative value of the extrinsic offense correlates positively with its likeness to the offense charged."); *see also McNair*, 605 F.3d at 1204 ("[E]vidence of similar conduct that occurs during the same time period has heightened probative value.") (internal citations omitted); *United States v. Brown*, 665 F.3d 1239, 1248 (11th Cir. 2011) (evidence of defendant's involvement with similar, uncharged fraudulent scheme was admissible to show intent and to negate the possibility of mistake; the other schemes closely resembled the charged conduct and occurred less than a year earlier).

The defendants engaged in nearly identical conduct and acted with the same state of mind as in the conduct charged.  For both the charged and uncharged conduct at issue, they created slush funds through the over-invoicing of manufacturing contracts with Vendor A, which did not have a legitimate business purpose.  Rather, they were used to fund bribes and pay kickbacks to defendant Vasquez and his designees.  The fact that both defendants received payments from these slush funds makes clear that they were aware of the slush funds' existence.  The surreptitious manner in which payments were made from the funds further establishes the defendants' corrupt intent.  Both the charged and uncharged conduct involved the use of alias or personal email accounts  to communicate about slush fund-related transactions, the employment of Vendor A as a third party intermediary to manage the slush funds on the defendants' behalf, the use of shell companies to send and receive payments from the slush funds, and the concealment of the source and nature of those payments through fraudulent contracts, invoices, or purported loans.  Another

important factor that weighs in favor of admitting this evidence is that the slush funds were all managed by Vendor A. Despite the funds being accounted for separately, the slush funds were often comingled in Vendor A-controlled bank accounts, further demonstrating the ongoing nature of the scheme and the defendants' continued control over the funds.

Evidence of the kickbacks from the 2016 Philippine election contracts is critical in proving defendant Vasquez's intent and knowledge, as it establishes that he was aware of and exercised contemporaneous control over the very source used to pay bribes to defendant Bautista, as charged in the indictment. Because the proposed evidence is being offered for the non-character purpose of demonstrating the defendants' knowledge and intent to violate the FCPA and money laundering statutes, as well as an absence of mistake or accident, it should be admitted.

Evidence of the kickbacks from the 2016 Philippine election contracts also establishes identity, proof of motive, and preparation and planning, which are all relevant and permissible for admission under FRE 404(b). In this scheme, defendant Vasquez received payments from Vendor A-managed slush funds, which connects him to the slush funds and further establishes his identity as a participant in the charged scheme. Proof of identity has greater relevance in this case because defendant Vasquez undertook significant efforts as part of the charged scheme to conceal his identity and distance himself from these slush funds (e.g., using personal/alias email accounts, coded language, shell companies, and fraudulent documentation).

       2. *Defendant Piñate's bribe payment to the Venezuelan Elections Official.*

Defendant Piñate's bribe payment to Venezuelan elections official, Lucena Ramírez, in connection with the Venezuelan elections is similarly admissible under FRE 404(b) to prove intent, identity, and *modus operandi*. Defendant Piñate, a Company 1 executive, bribed a foreign elections official seeking a corrupt benefit with regard to election-related business. This conduct

occurred close in time to the charged conduct (in early 2019 through 2020) and involved at least two of the same key players, namely, defendant Piñate and Individual 1.[8]  The means defendant Piñate used to transfer the property to Lucena Ramírez is highly relevant to intent, identity, and *modus operandi*.  First, he employed similar sophisticated means of transfer by using third parties and shell companies to disguise the purpose and nature of the transfer.  Second, he enlisted the aid of Individual 1 to effectuate the transfer of the house.  This is particularly relevant since Individual 1 played a very similar role in the charged conduct, acting as a middleman in both instances.  Individual 1 was defendant Piñate's trusted confidant and facilitated the movement of assets (funds in the case of the indictment, and a house in the case of the Venezuelan official) via shell companies, which the government alleges was for the purpose of furthering the respective bribery schemes.  These acts provide compelling evidence of defendant Piñate's corrupt intent, the nature of his relationship with Individual 1, and Individual 1's role in the charged scheme, including how defendant Piñate employed Individual 1 to advance his corrupt purpose.

### 3. *Defendant Vasquez's obstruction of justice.*

Defendant Vasquez's efforts to obstruct justice by instructing Vendor A-Executive to destroy evidence is highly probative of his intent and is properly admissible under FRE 404(b) to show consciousness of guilt.  *See United States. v. Poulsen*, 655 F.3d 492, 508-09 (6th Cir. 2011) ("Evidence of witness tampering was admissible as an 'other purpose' under Rule 404(b) because it 'tends to establish consciousness of guilt without any inference as to the character of the spoliator.'"); *United States v. Clark*, 24 F.4th 565, 580 (6th Cir. 2022) ("[E]vidence of a

---

[8] The indictment references Individual 1 and describes Individual 1's coordination with the defendants to facilitate the transfer of money to the Philippines through one of Individual 1's shell companies, in furtherance of the charged conduct.  *See* Indictment at 3, ¶10; at 11, ¶4; and at 12, ¶6.

defendant's consciousness of guilt is admitted under Rule 404(b) when he . . . tampers with evidence").  The timing of the obstruction and the nature of the evidence destroyed provide additional probative value.

Shortly after defendant Vaquez learned of the U.S. investigation, he traveled to Taiwan, met with Vendor A-Executive, and instructed him to destroy records and communications that were the subject of the U.S. investigation.  This included evidence that (1) the slush funds were managed by Vendor A-Executive on defendants' behalf, and (2) in August 2016, Vendor A-Executive sent approximately $1 million in bribe payments from the slush funds to defendant Bautista at defendant Vasquez's direction.  This evidence is vital to proving the allegations in the indictment.  Defendant Vasquez's efforts to destroy this evidence clearly demonstrates that he was aware of the slush funds, its criminal purposes, and its evidentiary value to U.S. investigators.  It also provides compelling evidence of defendant Vasquez's consciousness of guilt.

**C.     Evidence is sufficient to establish that the other acts were committed by the defendants.**

The second *Jernigan* factor requires there be sufficient proof that a jury could find by preponderance of the evidence that the defendants committed the extrinsic act.  *Jernigan*, 341 F.3d at 1280; *United States v. Bowe*, 221 F.3d 1183, 1192 (11th Cir.  2000) ("The prosecution can introduce evidence of a defendant's otherwise admissible acts if the jury could find by a preponderance of the evidence that the acts did in fact occur.").  This Circuit has found that a witness who provides detailed and specific testimony on direct and cross examination, and who relates incidents he or she observed and conversations he or she had with a defendant — while admitting to gaps in his or her knowledge — can provide a basis on which a jury can conclude a defendant committed extrinsic acts.  *Id*; *see also United States v. Trevino,* 565 F.2d 1317, 1319

(5th Cir. 1978) (holding uncorroborated statement of an accomplice may provide a sufficient basis to establish that the defendant committed extrinsic acts admissible under Rule 404(b)).[9]  In this case, the sufficiency of the evidence far exceeds what is required.  The other acts will be established through direct evidence consisting of witness testimony with detailed, first-hand accounts of the acts.  This testimony will be corroborated by documentary evidence, including records pertaining to finances, business, and travel, photographic evidence, and email and text communications.

> **D.    Admission of the other acts does not result in unfair prejudice.**

Under the third *Jernigan* prong, "the probative value of the [extrinsic] evidence must not be substantially outweighed by unfair prejudice," given the conduct already charged in the indictment.  *Jernigan*, 341 F.3d at 1282; *United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983) ("[I]n a criminal trial relevant evidence is inherently prejudicial" and, thus, the rule permits exclusion only when "unfair prejudice substantially outweighs probative value.").  This Circuit has cautioned that exclusion of relevant evidence, pursuant to "Rule 403 is an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility."  *United States v. Lopez*, 649 F.3d 1222, 1247 (11th Cir. 2011) (citing *United States v. Alfaro-Moncada*, 607 F.3d 720, 734 (11th Cir. 2010)); *see also Jernigan*, 341 F.3d at 1280 ( "Rule 404(b) is a rule of inclusion.").  "Rule 403 requires a court to 'look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact.'"  *Lopez*, 649 F.3d at 1247.  The balance to be struck is committed to the discretion of the district court and will not be set aside but for an abuse of discretion.  *Id.*

---

[9] *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as precedent all the decisions of the former Fifth Circuit decided prior to October 1, 1981.

The Court must make "a common sense assessment of all the circumstances surrounding the extrinsic offense, including prosecutorial need, overall similarity between the extrinsic act and the charged offense, as well as temporal remoteness." *Jernigan*, 341 F.3d at 1282; s*ee also United States v. Boston*, 249 F. App'x 807, 808 (11th Cir. 2007) (quoting *United States v. Perez*, 443 F.3d 772, 780 (11th Cir. 2006) (citation and quotation marks omitted)).

The evidence of other acts, as detailed above, is highly relevant to the charged conduct, particularly as it relates to the defendants' intent — a contested and material issue in the case.  As such, there is a strong prosecutorial need for this evidence.  *See United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1225 (11th Cir. 1993) (noting that there was greater prosecutorial need to admit 404(b) evidence since there is "special difficulty of proving intent in conspiracy cases").  The other acts — involving the creation of slush funds, kickbacks to defendant Vasquez, and defendant Piñate's payment of a bribe to a Venezuelan election official — are sufficiently similar to the charged conduct to warrant admission without triggering unfair prejudice because they demonstrate that the defendants employed the same or similar *modus operandi* and personnel to advance the charged and uncharged conduct.  *See Lopez*, 649 F.3d at 1247-48 (11th Cir. 2011) (concluding that co-conspirator testimony regarding prior or similar criminal involvement of the defendant provided context of the conduct charged and was not unduly prejudicial).  And defendant Vasquez's obstruction conduct provides relevant evidence of his consciousness of guilt and is similar to the other steps he took to conceal his participation in the charged scheme.  These acts are also temporally related to the charged conduct, occurring during or sufficiently close in time to the charged conduct to avoid any unfair prejudice.  *See United States v. Calderon*, 127 F.3d 1314 (11th Cir. 1997) (holding that even a six-year span between the prior offense and the charged conduct did not render the previous conviction too remote to be relevant to the defendant's intent).

Finally, any potentially unfair prejudice caused by admitting FRE 404(b) evidence would be ameliorated by an appropriate limiting instruction that would ensure the jury understands its permissible use.  *McNair*, 605 F.3d at 1204-05 (admitting evidence of uncharged bribes and instructing the jury as follows: "This evidence is being allowed for the limited purpose . . . as to what [the defendant's] intent may have been at the time that he may have made payments, or contributions, or gifts, to Mr. McNair."); *Edouard*, 485 F.3d at 1346 (district court's limiting instruction mitigated any unfair prejudice possibly caused by admission of prior bad act evidence); *see also United States v. Borja-Antunes*, 530 F. App'x 882, 886 (11th Cir. 2013) (finding that the court's limiting instruction reduced the risk of undue prejudice in admitting evidence of prior conviction); *Calderon*, 127 F.3d at 1333 (same); *Diaz-Lizaraza*, 981 F.2d at 1225 (same); *Edouard*, 485 F.3d at 1346 (same).  A limiting instruction will also ensure that the jury understands to which defendant this evidence applies.

## CONCLUSION

For the foregoing reasons, the United States hereby provides notice of its intent to introduce evidence in its case-in-chief that is intrinsic or inextricably intertwined with the charged conduct, and is, or would otherwise be admissible against the defendants, pursuant to Rule 404(b) of the Federal Rules of Evidence (FRE 404(b)).

Respectfully submitted,

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

LORINDA I. LARYEA
ACTING CHIEF, FRAUD SECTION
Criminal Division
U.S. Department of Justice

By: /s/ Robert J. Emery
Robert J. Emery

By: /s/ Connor Mullin
Connor Mullin (A5503222)

Assistant United States Attorney
Court No. A5501892
99 Northeast 4th Street
Miami, Florida 33132, 7th Floor
(305) 961-9421
(305) 536-7213 (fax)
Robert.Emery2@usdoj.gov

Jil Simon (A5502756)
Fraud Section, Criminal Division
1400 New York Ave. NW
Washington, DC 20005
Tel: (202) 993-4828
Connor.Mullin2@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was electronically filed with the Court's CM/ECF system on August 1, 2025.


By:     /s/ Robert J. Emery
        Assistant United States Attorney